UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. *15CV81627 Middlebrooks/Brannon*

UNITED STATES,

    ex rel.

ELVENS VERTUS,

    Plaintiff,

v.

GLADES DRUGS, INC.;
LONGEVITY DRUGS, LLC;
RYAN GOODKIN; TERRENCE
MYERS; and SANTO LEO,

    Defendants.

_____/

**FILED UNDER SEAL**

FILED by _____ D.C.

DEC 0 1 2015

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## QUI TAM COMPLAINT

The Relator, Elvens Vertus, brings this qui tam action in the name of the United States against Glades Drugs, Inc. ("Glades Drugs") and Longevity Drugs, LLC ("Longevity Drugs"), as well as against their owners and principals Ryan Goodkin, Terrence Myers, and Santo Leo (collectively, "Defendants"), and states as follows:

### OVERVIEW

1.    This is a False Claims Act case arising from fraud against federal healthcare programs involving compounded pharmaceuticals. The Relator is a former employee of Glades Drugs, a business that was and is in the business of manufacturing and selling compounded pharmaceuticals and then seeking reimbursement from various federal and state healthcare programs.

2.     During his term of employment, Relator discovered that Defendants had been engaged for many years in a variety of schemes to defraud federal and state healthcare programs, including:

A.     <u>Paying Co-Payments & Deductibles</u>.   Relator discovered that Glades Drugs had an ongoing practice, not simply to *waive* patient co-payment and deductible obligations, but to affirmatively *pay* those obligations on behalf of patients, using means that were difficult to trace, such as pre-paid credit cards.  This scheme had twin aims: (1) to relieve patients of the burden of paying co-payments themselves; and (2) to conceal from the Government the fact that patients had not made the co-payments.  Instead, auditors would find proof that the payments had been fully satisfied by credit cards (without knowing that the credit cards had been purchased by the pharmacy itself).

B.     <u>Paying Kickbacks to Patients</u>.   Separate and apart from co-payments, Glades Drugs also had an ongoing policy to offer free gift cards as kickbacks to patients who attempted to return expensive compounded pharmaceuticals.  Glades Drugs regularly offered $50 or $100 payments to patients who insisted they did not want or need the pain creams, scar creams and other medications mailed to them.

C.     <u>Illegal Patient Recruiting</u>.   Relator also learned that Glades Drugs and Longevity Drugs worked together to offer employees an incentive system to recruit patients to purchase compounded pharmaceuticals.   These companies offered to pay employees 20% of the revenue generated from

2

any patients they recruited.   Moreover, the Defendants would arrange to have a complicit doctor sign any prescription necessary to order the compounded medications.

D.      <u>Medically Unnecessary Prescriptions</u>.  Relator also observed that Glades Drugs manipulated prescriptions and its formulary to maximize profit with little regard for medical necessity.

On information and belief, these combined schemes resulted in millions of dollars of waste and abuse of taxpayer funds.

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

4.      The Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in and transact the business that is the subject matter of this lawsuit in the Southern District of Florida.

5.      Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the acts complained of herein occurred in Palm Beach County, Florida, within the Southern District of Florida.

6.      Pursuant to 31 U.S.C. § 3730, this Complaint is to be filed *in camera* and remain under seal for a period of at least sixty (60) days, unless the Government requests an extension.

## THE RELATOR

7.      The Relator Elvens Vertus resides in the State of Florida.  He is a licenced Pharmacy Technician and worked at Glades Drugs from approximately July 2014 to February 2015 as a Patient Coordinator.  In that capacity, his duties included speaking to customers by

3

telephone, processing prescription orders, arranging for co-payments to be made and conducting an internal self-audit of prescription records.

8.      Relator began his work at the Glades Drugs office located at 1095 Broken Sound Parkway NW, Suite 300, Boca Raton, FL 33487.   He later transferred to work at an office operated by a sister company, Longevity Drugs, at 101 N. Federal Highway, Lake Worth, Florida 33460.   While Relator worked in this Longevity Drugs office, he nonetheless continued to work for Glades Drugs, as the two companies had overlapping ownership.   He therefore gained personal knowledge regarding the workings of both companies.

## THE DEFENDANTS

9.      Defendant Glades Drugs, Inc. ("Glades Drugs") is a Florida corporation with headquarters in Palm Beach County, Florida.  Glades Drugs operates pharmacies with offices in Boca Raton, Pahokee, and Lake Worth, Florida.   Founded in 1965, the pharmacy does a great deal of mail order business, including mail order compounded pharmaceuticals.  In recent years, Glades Drugs has seen explosive growth.  According to the company's website, in August 2014, the pharmacy sought to employ up to 100 workers in its new Lake Worth location.

10.      Defendant Longevity Drugs, LLC ("Longevity Drugs") is a Florida limited liability company that does business under the name of "Tru Valu Drugs."  Longevity Drugs operates a retail pharmacy at 101 North Federal Highway, Lake Worth, Florida 33460.  The company also operates a laboratory at that location, which manufactures compounded pharmaceutical drugs.  On information and belief, all of the compounded pharmaceuticals at issue in this case were manufactured by Longevity Drugs.

11.      Defendant Ryan Goodkin resides in Palm Beach County and is a registered pharmacist in the State of Florida, license number PS 45058.  On information and belief he,

4

along with co-Defendant Terrance Myers, is a co-owner and principal of Glades Drugs and Longevity Drugs.

12.     Defendant Terrence Myers resides in Florida and is a registered pharmacist in the State of Florida, license number PS 44237.   On information and belief, he, along with co-Defendant Ryan Goodkin, is a co-owner of Glades Drugs and Longevity Drugs.

13.     Defendant Santo Leo resides in Florida and is the Chief Operating Officer of Glades Drugs.   At all relevant times, he worked as Relator's direct supervisor and gave him instructions on a day-to-day basis.   On information and belief, Leo is also a part owner of Glades Drugs.

## BACKGROUND

### Compounded Pharmaceuticals

14.     Pharmacy compounding is a practice by which pharmacists combine, mix, or alter ingredients to create customized medication for individual patients in response to a prescription from a licensed practitioner.   *See Compounded Drugs Under Medicare Part B: Payment and Oversight* (HHS–OIG April 2014).   Physicians might prescribe compounded pharmaceuticals for a variety of reasons, including:

- a patient might be allergic to dyes or preservatives in a non-compounded version of the same medication;

- a patient might need a specially tailored dosage strength; or

- non-compounded versions of the medicine are simply not available.

*Id.*

15.     Because compounded pharmaceuticals are tailor-made for each patient, they fall under the category of "unapproved drug – other" within FDA regulations.   Compounded

5

pharmaceuticals do not contain their own unique National Drug Control or "NDC" numbers, although component ingredients may contain such numbers.   Also, because compounded pharmaceuticals are tailor-made for each patient, they can be quite expensive.

16.    Recent years have seen an explosion of fraud within the area of compounded pharmaceuticals.   As has been widely reported in the press, unscrupulous pharmacies, through a variety of means, have found it easy to defraud Government healthcare programs and insurance companies in the area of compounded pain medications.

### Government Reimbursement Programs for Compounded Pharmaceuticals

17.    The Government commonly pays for compounded medications under one of three avenues.

### *The Medicare Program*

18.    Congress enacted the Medicare program in 1965 as Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*  The program provides medical insurance for persons age 65 and older or for persons under age 65 who are disabled.   The United States Department of Health and Human Services ("HHS") supervises the Medicare program through the Centers for Medicare and Medicaid Services ("CMS").

19.    The Medicare program consists of several parts, including Parts A, B and D.  Part A, funded by Social Security taxes, provides major medical insurance coverage for the cost of hospital care, related post-hospital services, home health services and hospice care.  *See* 42 U.S.C. §§ 1395c – 1395i.  Medicare Part A provides benefits for drugs administered in inpatient settings, such as hospitals.

20.    Part B is a federally subsidized, voluntary health insurance program that provides benefits for outpatient settings.  Medicare Part B provides limited benefits for drugs administered

to patients in certain outpatient settings, such as physician offices.

21.     In 2003, Congress created Medicare Part D, which established a voluntary prescription drug benefit program.  All persons enrolled in Medicare Part A and Medicare Part B are eligible to enroll in a prescription drug plan under Part D.   CMS contracts with private companies, known as "sponsors," authorized to sell Part D insurance coverage.  Such companies are regulated and subsidized by CMS pursuant to one-year annually renewable contracts.

22.     A pharmacy is considered a "provider" or "downstream entity" under Medicare regulations.  *See* 42 CFR §§ 423.401 & 423.501; Centers for Medicare and Medicaid Services, Prescription Drug Benefit Manual, Pub. 100–18 (2006), Ch. 9, Section 10.1.

### *The Medicaid Program*

23.     Medicaid is a public assistance program that provides for payment of medical expenses for low-income patients, with funding shared between the federal government and state governments.  *See* 42 U.S.C. § 1396a(a)–(b).   States pay healthcare providers, including pharmacies, according to established rates, and the federal government then pays a statutorily established share of the "total amount expended … as medical assistance under the State plan." *See* 42 U.S.C. § 1396b(a)(1).  Although Medicaid is administered on a state-by-state basis, the state programs are required to adhere to federal guidelines.

### *TRICARE & Other Federal Healthcare Programs*

24.     The Federal government administers other health care programs, including but not limited to, TRICARE/CHAMPUS, CHAMPVA, the Federal Employee Health Benefit Program and Federal Workers Compensation Programs.   TRICARE/CHAMPUS, administered by the United States Department of Defense, is a healthcare program for individuals and dependents affiliated with the armed forces.  CHAMPVA, administered by the United States Department of

Veterans Affairs, is a healthcare program for the families of veterans with 100% service connected disability. *See* 38 U.S.C. §§ 1781–1786. The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees, retirees and survivors. *See* 10 U.S.C. §§ 1971–1104

### *Limitations on Reimbursement*

25.     The Government imposes a number of limitations on reimbursement that are relevant to this case. First, Medicare only pays for services that are "medically necessary." In other words, Medicare requires, as a condition of coverage, that services be "reasonable and necessary for the diagnosis or treatment of illness or injury." *See* 42 U.S.C. § 1395y(A)(1)(a). Providers who wish to participate in the Medicare program must ensure that their services are provided "economically and only when, and to the extent, medically necessary." *See* 42 U.S.C. § 1320c-5(A).

26.     Next, federal law prohibits providers from making "any false statement or representation of a material fact in any application for any… payment under a federal healthcare program." *See* 42 U.S.C. § 1320a-7(B)(A)(1). Similarly, federal law requires providers who discover material omissions or errors in claims submitted to Medicare, Medicaid or other federal health care programs to disclose those omissions or errors to the government. *See* 42 U.S.C. § 1320a-7(B)(A) (3). Likewise, Medicare Part D plan providers cannot participate in "false, fraudulent, or abusive activities affecting the Medicare, Medicaid, or other state or federal health care programs, including submission of false or fraudulent data." *See* 42 CFR § 423.509 (A)(4).

27.     Finally, the Medicare and Medicaid Fraud and Abuse Statute (the "Anti-Kickback Statute") penalizes anyone who knowingly and willfully solicits, receives, offers or pays

8

remuneration to induce, or in return for, referring the purchasing, recommending or ordering of services that are reimbursable in whole or in part under Medicare, or purchasing, ordering, arranging for, or recommending for purchase, order or arrangement for any service reimbursable in whole or in part by Medicare. *See* 42 U.S.C. § 1320a-7b(b)(1),(2). Remuneration includes the transfer of anything of value, in cash or in-kind, directly or indirectly, covertly or overtly. *See United States ex rel. Bartlett v. Ashcroft*, No. 3:04-57, 2014 WL 4179862, at *16 (W.D. Pa. Aug. 21, 2014) ("The Anti–Kickback Statute forbids any person or entity from knowingly and willfully offering, paying, soliciting, or receiving anything of value ('remuneration') to influence the referral of items or services reimbursable by a federal healthcare program."); *Klaczak v. Consolidated Med. Transport*, 458 F. Supp. 2d 622, 678 (N.D. Ill. 2006) ("Remuneration, for purposes of the AKS, is defined broadly, meaning 'anything of value.'").

28.     As set forth below, Defendants violated each of the above prohibitions in this case, resulting in substantial waste and abuse of taxpayer dollars.

## Internal Procedures at Glades Drugs

29.     To understand the fraudulent schemes operated by the Defendants, it is helpful to first understand the internal procedures in place at these companies for filling prescriptions for compounded pharmaceuticals.   The following procedures applied during Relator's term of employment.

30.     Step 1 – Generate a Lead:  Although Relator was not personally involved in this step, the prescription process began with the generation of a lead, *i.e.*, a person who might need or want compounded medications.   On information and belief, Glades Drugs employed telemarketers, both inside and outside the United States, to call potential customers to inquire

9

whether potential customers had pain or other conditions that might warrant a compounded medication.  If so, the telemarketers were trained to gather the customer's doctor and insurance information.

31.    In addition to using telemarketers, Glades Drugs and Longevity Drugs also acquired leads (and ultimately customers) by paying incentives to employees to recruit personal friends, family members, and acquaintances to become patients.

32.    <u>Step 2 – Confirm the Order</u>:  Once a lead was acquired, the lead was referred to Glades Drugs for a follow-up call to confirm the precise order to be placed.  This job was performed by Relator, as well as fellow Glades Drugs employees Ali Ifran, Javonne Miller, and others.    During this phase, Glades Drugs trained employees to push the compounded medications and to assure the patient that it would be delivered at no cost, as further described below.

33.    Of great significance, Glades Drugs did not train employees to determine which medications might be the best, or most medically necessary, for any given patient.  Instead, Glades Drugs trained employees to ask questions designed to determine which medications would be covered by the customer's insurance, so that the most expensive prescriptions possible could be written.

34.    <u>Step 3 – Send the Prescription to the Doctor</u>:    Based on the outcome of Step 2, Glades Drugs then prepared and sent one of its pre-filled prescription forms to the patient's doctor, usually by fax.  This job was performed by Relator, as well as fellow Glades Drugs employee Rodney Kahane and others.  In this phase, the priority goal was to ensure that the doctor signed and returned the prescription to Glades Drugs.

35.     Many times, doctors simply signed the prescriptions and sent them back.  If this was the case, Glades Drugs proceeded to step 4.  Other times, however, doctors refused to sign, as they had not prescribed the medication themselves.  In such cases, Glades Drugs trained employees to call the patient and ask the patient to urge his or her doctor to sign the prescription.  Sometimes this worked; sometimes it did not.

36.     Step 4 – Adjudication:  Once Glades Drugs obtained a signed prescription from the physician, the company processed each prescription electronically with the relevant insurance company or government program, a process known as "adjudication."  The insurance companies included Medicare and Medicaid carriers such as MedCo/Express Scripts, Aetna, Coventry Medicare, United Healthcare/OptumRx and Caremark.  Relator worked in this function during much of his time at Glades Drugs.  During this process, the insurance company would commonly report the amount of co-payment or deductible obligation owed by the customer as well as the amount covered by the carrier.

37.     If the insurance company approved or "adjudicated" the order, Glades Drugs proceeded to Steps 5 and 6 (although not always in the same order).   If the insurance company did not approve the order, Glades Drugs assigned an employee to solve whatever problem had been identified by the company.  Relator spent much of his time in this process as well.

38.     Step 5 – "Collect" the Co-Payment:  Once Glades Drugs received confirmation that an insurance company had approved the order, the company proceeded to the next step, which involved making sure that all applicable co-payments were "collected" before the product shipped.   Relator and fellow employee Javonne Miller worked on this step.

39.     As further explained below, collection consisted of two parts.  First, call the customer and ask them to pay.  Next, if the customer gave any push-back, just pay it using a

stack of pre-paid credit cards.  On or about August 26, 2014, Defendant Santo Leo also advised employee Javonne Miller to tell the customer that, if an insurance company called them to ask about the co-payment, to tell the insurance company that they (the customer) had paid the co-payment "with a cc [credit card]."

40.     Step 6 – Print the Label & Ship the Product:  Once the co-payment was collected (legitimately or illegitimately), Glades Drugs printed a label for the medication and sent the label to the laboratory operated by Longevity Drugs.    From there, Longevity Drugs manufactured the compounded medications and shipped them to customers under the Glades Drugs label.

## THE FRAUDULENT SCHEMES

41.     From on or about July 2014 to the present, Defendants have been engaged in the following illegal schemes to increase revenue at taxpayer expense.

### Scheme # 1 – Paying Co-Payments & Deductibles

### Routine Waiver of Co-Payments is Illegal

42.     In 1994, HHS-OIG issued a Special Fraud Alert warning that the routine waiver of Medicare co-payments and deductible obligations constitutes a violation of the federal Anti-Kickback Statute and False Claims Act.    Thereafter, in 1996, Congress amended the definition of "remuneration," to specifically include the "waiver of copayments and deductible amounts (or any part thereof)."  See 42 U.S.C. § 1320a – 7A (i)(6).

43.     The Special Fraud Alert reasoned that waiver of co-payment and deductible obligations functions as a kickback because it gives the patient something of economic value, i.e., forgiveness of a financial obligation, as an inducement to purchase or utilize the provider's services.

44.     In addition, by law, Medicare typically pays only 80% of the reasonable charges for items and services under 42 U.S.C. § 1395i(a)(1).   When a provider routinely waives co-payments, the provider surreptitiously lowers his or her prices, a fact not disclosed to the Government.   This results in a misrepresentation as to the amount the provider is <u>actually</u> charging to patients for covered items or services, which leads to a false claim upon the Government.

45.     Finally, waiver of co-payments also results in over-utilization of services.   As an example, a typical patient who is charged a co-payment for an expensive compounded pharmaceutical might be expected to object, especially when the medication is not necessary or effective.   Once co-payments are waived, however, this problem often disappears because the patient is not required to pay anything.   Patients who receive products or services completely free of charge object far less often than those who are required to pay co-payments.   This makes it far easier for fraudsters to engage in schemes that involve over-utilization of covered items and services.

**Defendants Not Only Waived Co-Payments, but Actually Paid Them on Patient's Behalf**

46.     Compounded pharmaceuticals are extremely profitable.   Because these products were often medically unnecessary, however, patients of Glades Drugs were prone to reject delivery if it required them to pay anything, even a modest co-payment below $50.   To overcome this problem, Glades Drugs employed several methods to eliminate the problem of co-payments.

47.     First, Glades Drugs trained Javonne Miller, Ali Irfan, and other employees to offer rebates during phone calls dealing with co-payments.   Realtor has obtained a script used to train employees.   It provided as follows:

> Hello this is _____ calling from Glades Drugs .

13

I am a patient coordinator and calling to verify that you have received your prescription. Have you found everything okay with your experience with Glades Drugs so far?

…

Okay that's wonderful. I did notice that you have a co-pay on file that your insurance is requiring that we collect.  I have good news however and our pharmacy offers up to $50 in monthly rebates for our customers.

So although I have to collect $ ___ (their co-pay amount) today, at the end of the month you will receive a rebate check in the mail for $___ (up to $50)


If the co-pay is over $50 let them know about the money back guarantee if they are not satisfied with the product/experience.


If they decline that ask them if they take vitamins or supplements monthly, and offer them a free supply with their monthly prescription with us.

48.    The above sales script essentially amounted to offering bribes to patients to pay the co-payment, *i.e,* "If you pay the co-payment now, we will reimburse you for it at the end of the month."  This was blatantly illegal.

49.    Nevertheless, this method did not prove effective enough for Glades Drugs. Many customers simply refused to pay out-of-pocket for any reason, even with the promise of reimbursement at the end of the month.  Glades Drugs therefore developed a second method – paying the co-payment for the patient with an internal Glades Drugs customer loyalty card.  This

was not a cash vehicle but a points systems.   Thus, Glades Drugs would create a customer loyalty card for the customer and apply "points" to offset the amounts due as co-payments.

50.     Even this method failed to be fool proof however.   Relator learned from other employees that, prior to Relator joining Glades Drugs, an insurance company had conducted an audit and objected to co-payments being satisfied via customer loyalty cards.

51.     Ultimately, therefore, Glades Drugs developed a third and more reliable method to falsify co-payment "collections."   The company began to purchase stacks of pre-paid American Express or other credit cards and to use those credit cards to pay co-payments on behalf of patients.   The scheme satisfied twin aims of concealment.   First, it relieved customers of the burden of paying co-payments themselves.   Second, it created a reliable paper trail in case auditors examined the file.   Auditors would see that the co-payment had in fact been paid, using a credit card.   (Auditors would not know the credit card had been purchased by the pharmacy, rather than the customer).

52.     In an August 26, 2014 email, Defendant Leo confirmed in writing to employee Javonne Miller that she should work exclusively on customer co-payments every Monday.   Leo gave Miller specific instructions on how to handle these co-payments, and Miller memorialized her instructions from Leo in handwritten notes:

> Pt that can't pay copayment let them know we covered it with a customer loyalty card and <u>if insurance call let them know you paid it with a cc</u> <u>[credit card].</u>

(Emphasis added).   In other words, Glades Drugs actually told its employees to instruct customers to lie to insurance companies (and the Government) in the event the patient was contacted.

53.     Defendant Leo sent numerous emails to employees that gave express instructions regarding the use of pre-paid credit cards.    On January 7, 2015, for example, Leo instructed employee Yael Meisler to order more pre-paid cards:

> Yael please give them cards to pay the $50 and indeed.  Order larger cards ($50 increments) and get 50 of them for the future.

54.     On February 2, 2015, Leo again confirmed -- in writing -- the policy to use a prepaid card to pay copayments:

> after any of the following circumstances under $50 use a prepay:
>
> -     no answer after three morning and three afternoon contact attempts over three business days
>
> -     cannot afford and is okay with help if found
>
> -     disconnected number

55.     Other examples include:

> "All of the ones $1-$50.00 should be squared away with Yael when the cards come in."  (1/9/15 email, referring to a list of more than 30 prescriptions).
>
> …
>
> "Approved for prepay."   (1/14/15 email, referring to a list of five prescriptions).
>
> …
>
> "Please process these copays… ASAP." (1/14/15 email, referring to a list of five prescriptions).
>
> …

16

"Prepay these outstanding copays for these inactive customers."  (1/15/15 email, referring to a list of three prescriptions).

…

"These are past due from the audit, please prepay then and confirm when done."  (1/20/15 email, referring to a list of twelve prescriptions).

## Specific False Claims

55.     Relator has assembled the following specific examples of claims submitted to the federal government for which Glades Drugs waived and/or paid co-payments using a pre-paid credit card.  This is not a complete list of all false claims, but a representative example.

| Date | Customer Initials | Medication | Carrier |
|------|------------------|------------|---------|
| 7/10/14 | A.S. | Pain Compound | United Health/CMS |
| 10/31/14 | D.S. | Migraine Compound | Coventry/CMS |
| 12/22/14 | P.M. | Pain Compound | UHC/CMS |
| 12/29/14 | B.K. | Pain Compound | AARP/CMS |
| 11/7/14 | B.R. | Pain Compound | Coventry/CMS |
| 9/29/14 | S.B. | Pain Compound | Part D |
| 9/8/14 | Y.L. | Pain Compound | Part D |
| 10/21/14 | M.T. | Pain Compound | Coventry/CMS |
| 12/31/14 | M.T. | Pain Compound | Coventry/CMS |
| 11/19/14 | T.W. | Pain Compound | BCBS/CMS |
| 12/29/14 | R.W. | Pain Compound | TRICARE |
| 1/1/15 | C.A. | Pain Compound | TRICARE |
| 12/30/14 | G.G. | Pain Compound | TRICARE |
| 10/10/14 | S.H. | Pain Compound | TRICARE |

| 12/23/14 | R.N. | Pain Compound | Coventry/CMS |
| 12/16/14 | G.M. | Pain Compound | Coventry/CMS |

### **Scheme #2 – Kickbacks To Keep Product**

56.     Many times during Relator's tenure at the company, customers did not want to keep the compounded medications sent to them.  Even though the co-payments had been paid for them, the customer still did not want or need the product and insisted on sending it back.  This was a very unprofitable occurrence for Glades Drugs, so the company set up a system to prevent it from happening.

57.     In January 2015, Defendant Leo revised the computer system to create categories or "queues" for various customer issues.   One queue was titled "Cancellation," which Leo explained as follows in an email:

> Cancellation > they are no longer interested – they simply don't want the cream – nothing to do with co-pays (this helps Ali saved them)

58.     The method that Glades Drugs used to "save" cancellations was to offer kickbacks to the customers who wished to cancel.  Relator worked near the office of Glades Drugs employee Ali Irfan and heard him, on a daily basis, calling customers in the cancellation queue and offering gift cards of $50 or $100 to convince customers to keep their products and not send them back.

59.     Because gift cards are expensive, the company was careful to use kickbacks only when necessary.   Thus, in an email dated August 29, 2014, Defendant Leo complained that employee Javonne Miller had used a gift card too early.   As Leo explained:

> The only people who should get offered this are people who are
> complaining of a defective product or ineffective formula and are
> frustrated and threatening to cancel.

60.     Relator estimates that Glades Drugs offered gift cards to customers on a daily basis during his tenure.   Although he does not have exact counts, he estimates Glades Drugs gave away in excess of one hundred gift cards during his tenure at the company.

### Scheme #3 – Improper Patient Recruiting

61.     In or around early February 2015, Relator asked his supervisor Defendant Leo for a raise.  Leo responded that Relator needed to speak to Defendant Ryan Goodkin, who worked in the same Lake Worth office location as Relator.   When Relator approached Goodkin about the raise, Goodkin told Relator he could earn extra money by recruiting patients to have their compounded medications filled by Glades Drugs or Longevity Drugs.   Goodkin told Relator to speak to a Longevity employee named Lio Alonso, who had been very successful in recruiting patients.

62.     Relator then met with Alonso, a Longevity employee who worked in the same physical location as Relator.  Alonso explained that Glades Drugs and Longevity Drugs would pay any employee 20% of all revenue earned from customers recruited to the pharmacy.  Alonso encouraged Relator to gather family, friends, church members or anyone else he knew who might be able to have a prescription filled.  Alonso explained that TRICARE customers were especially good.

63.     Relator questioned how this was possible and explained that he, Relator, did not know many people who needed compounded medications.  Alonso explained that he sent all of his referrals to Dr. David Simon in Lake Worth, who would sign any prescriptions sent to him by

Glades Drugs/Longevity Drugs.

64.     Alonso then showed Relator a spreadsheet that he kept in his desk of all income

he had made from his referrals.  Alonso explained that he had made over $200,000 from referrals

during the past year alone.  Alonso cautioned Relator that, should he recruit patients, to make

sure the prescriptions were processed by someone else.  He, Alonso, tried to avoid processing the

paperwork on his own referrals.

### Scheme #4 – Unnecessary Pain Medications

65.     As set forth above, a great amount of Glades Drugs' business did not originate

with legitimate prescriptions from doctors, but instead from telemarketers and recruiters.  This

led to a perverse sequence of medical events, namely, the initial prescriptions were not being

written by doctors, but rather by low-level pharmacy employees with little or no medical

training.  These employees interviewed patients over the phone and then made the initial

determination as to the types and dosages of medications needed by patients.

66.     These pharmacy employees were not trained to determine the best or most

appropriate medications necessary for patient treatment.  (Not even a trained physician could

make such a determination based on a phone call alone.)  Rather, the pharmacy employees were

trained to question customers as to their insurance coverage and then select the highest-

reimbursable compounded medication available.

67.     Moreover, Defendants were always on the lookout for chances to upgrade

prescriptions to make them more profitable.  In or around February 2015, for example,

Defendant Terrance Myers discovered that a compounded medication known as flurbiprofen

baclofen cyclobenzaprine gabapentin lidocaine ("FBCGL") carried a much higher

reimbursement rate than another compounded medication, piroxicam baclofen cyclobenzaprine

gabapentin lidocaine ("PBCGL").  Defendant Myers immediately instructed his subordinates to begin the process for revising PBCGL prescriptions to FBCGL prescriptions instead.

68.  Thus, on January 29, 2015, Defendant Leo wrote:

Based on my discussions with Terry [Myers] yesterday all our PBCGL's should be changed to FBCGL for the most part.

Once they are rebilled and their PBCGL is confirmed delivered, I added an action to the status "Shipped Pending Delivery" called "Switch to FBCGL 20"; once the audit is complete please take this action instead of Audit Complete for anyone who is covered for the higher-paying FBCGL.

(emphasis added).

69.  Relator did a great deal of the work involved in changing these prescriptions, which involved sending new prescriptions to doctors for the more expensive FBCGL product.

70.  On February 4, 2015, Defendant Leo notified his employees to be on the lookout for any old PBCGL orders that had been reversed for any reason, as this would be an opportunity to re-do the order with the more expensive FBCGL product instead:

We are working on getting FBCGL formula changes; so anything reversed please check with Rx's in Velocify to see if we got FBCGL so you can rebill it with that formula.

Velocify was the name of the company's internal patient tracking software.

71.  As an example, one customer, prescription number 1042513, failed to receive a shipment of PBCGL in or around January 2015 because Glades Drugs had the wrong address on file.  Defendant Leo seized upon this mistake as an opportunity to upgrade the prescription to

FBCGL.  He wrote:

> We got a FBCGL for this person too, we should start looking at who we
> got FBCGL's for in the shipping pending delivery and see if we can
> reverse and change to FBCGL instead of PBCGL if we didn't ship them
> yet.

In other words, Defendant Leo wanted to find any customers with existing PBCGL prescriptions that had been returned or not yet shipped, so that the prescriptions could be upgraded to FBCGL.

72.     The above conduct constituted an unbelievable disregard for patient welfare.  The switch to FBCGL was not motivated by any legitimate medical purpose.  Shockingly, Defendants did not even take steps to notify *patients* that prescriptions were being altered. Defendants altered these prescriptions solely to achieve the higher reimbursement for FBCGL.

### Attorneys' Fees and Conditions Precedent

73.     On information and belief, the fraudulent schemes outlined above have caused the Government to pay false claims in the millions of dollars.

74.     The Relator has hired the undersigned counsel and is obligated to pay a reasonable attorneys' fee.

75.     All conditions precedent have been performed or waived.

76.     The allegations and transactions described in this Complaint have not been publicly disclosed within the meaning of the False Claims Act.  To the extent a public disclosure has taken place, Relator is the original source of the information in this Complaint.  That is to say, he has  knowledge that is independent of and materially adds to any publicly disclosed information.

**Count I**
**31 U.S.C. § 3729(a)(1)(A)**

77.     The Relator realleges the allegations made in Paragraphs 1 through 76.

78.     This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §§ 3729-32, as amended.

79.     Through the acts described above, Defendants and their agents and employees knowingly presented and caused to be presented to the Government false or fraudulent claims for compounded pharmaceuticals.

80.     The Government, unaware of the falsity of the claims made or caused to be made by the Defendants, approved, paid, and participated in payments made by the Government's fiscal intermediaries for claims that otherwise would not have been allowed.

81.     By reason of these payments and approvals, the Government has been damaged and  continues to be damaged, in an amount yet to be determined.

**Count II**
**31 U.S.C. § 3729(a)(1)(B)**

82.     The Relator realleges the allegations made in Paragraphs 1 through 76.

83.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*

84.     Through the acts described above, Defendants knowingly made, used and caused to be used false records and statements material to get false or fraudulent claims paid or approved by the Government.

85.     The Government was unaware of the falsity of the records, statements, and claims submitted by Defendants and their agents, principals, employees, and contractors for claims that would not have been paid had the truth been known.

86.     By reason of the Defendants' false records, statements, and claims, the Government has been damaged, in an amount yet to be determined.

**Count III**
**31 U.S.C. § 3729(a)(1)(C)**

87.     The Relator realleges the allegations made in Paragraphs 1 through 76.

88.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*

89.     Through the acts described above, Defendants conspired to commit violations of 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B).

90.     By reason of the Defendants' conduct, the Government has been damaged.

WHEREFORE, the Relator requests that judgment be entered against Defendants, ordering that:

a.      Defendants cease and desist from violating the False Claims Act, 31 U.S.C. §3729 *et seq.*;

b.      Defendants pay an amount equal to three times the amount of damages the Government has sustained because of Defendants' actions, plus a civil penalty against Defendants of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

c.      The Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

d.      The Relator be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d); and

e.    The Government and the Relator be granted all such other relief as the Court deems just and proper.

### Jury Demand

Pursuant to Federal Rule of Civil Procedure 38, the Relator hereby demands a trial by jury.

Dated: December 1, 2015                          Respectfully submitted,

**McCabe Rabin, P.A.**
1601 Forum Place, Suite 505
West Palm Beach, FL 33401
561-659-7878
Ryon M. McCabe
Florida Bar No. 009075
rmccabe@mccaberabin.com
Robert C. Glass
Florida Bar No. 052133
rglass@mccaberabin.com